MAINE SUPREME JUDICIAL COURT                           Reporter of Decisions
Decision:      2026 ME 13
Docket:        BCD-25-63
Argued:        November 14, 2025
Decided:       February 10, 2026

Panel:         STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, and DOUGLAS, JJ.

WALDO COMMUNITY ACTION PARTNERS

v.

DEPARTMENT OF ADMINISTRATIVE AND FINANCIAL SERVICES et al.

DOUGLAS, J.

[¶1]  In this appeal we consider whether a state agency violated state procurement laws, *see* 5 M.R.S. § 1825-B (2025), in awarding a contract to provide brokerage services for medical nonemergency transportation (NET) in one of Maine's eight identified transit regions.  Pursuant to a competitive bidding process, the Maine Department of Health and Human Services (DHHS) awarded the contract to the highest-ranked bidder, ModivCare Solutions, LLC, a vendor already providing the same service in several other regions of the state, over the incumbent service provider in the area at the time, Waldo Community Action Partners (Waldo CAP).

[¶2]  Waldo CAP appealed the decision to a committee of the Department of Administrative and Financial Services (DAFS) designated to hear appeals

under 5 M.R.S. § 1825-E(3) (2025). The DAFS appeal committee affirmed DHHS's award of the contract. Waldo CAP then filed in the Superior Court a petition for judicial review of the appeal committee's decision, *see* 5 M.R.S. §§ 1825-F, 11001(1) (2025); M.R. Civ. P. 80C, and the court (*McKeon, J.*) entered a judgment in the Business and Consumer Docket affirming the decision of the appeal committee.

[¶3] Waldo CAP contends that both the appeal committee and the Superior Court erred in affirming DHHS's decision because the award of the contract to ModivCare violated the competitive bidding statute and because the DHHS decision was arbitrary and capricious. We disagree and affirm the judgment upholding the award.

## I.  BACKGROUND

[¶4] We draw the facts from the appeal committee's findings, which are supported by the administrative record. *See* 18-554 C.M.R. ch. 120, §§ 3(4), 4(1) (effective May 24, 1995) (authorizing an evidentiary hearing before the committee); *Gray v. Dep't of Pub. Safety*, 2021 ME 19, ¶ 10, 248 A.3d 212. We present the procedural history as reflected in the administrative and court records. *See, e.g.*, *Pine Tree Legal Assistance, Inc. v. Dep't of Hum. Servs.*, 655 A.2d 1260, 1261-62 (Me. 1995).

## A.  The Request for Proposals for NET Brokerage Services

[¶5]  DHHS contracts with private entities[1] to manage and coordinate medical NET services for individuals eligible for MaineCare, which is Maine's Medicaid program, and the Children's Health Insurance Program.  NET services enable eligible individuals who otherwise do not have transportation to travel to and from covered services for nonemergency medical needs such as doctor's appointments and dialysis.  Brokers arrange the various modes of transportation and schedule individual trips for the users of the service.  Separate brokerage contracts are awarded for each of eight identified regions of the State.[2]

[¶6]  Waldo CAP has been the vendor providing NET brokerage services for Region 5 since 2014.  Several years ago, DHHS decided to put out to bid brokerage contracts in all eight regions of the state.  DHHS and DAFS jointly

---

[1]  When contracting for services to be provided by private entities, DHHS and all other state agencies are generally required to utilize a competitive bidding process.  5 M.R.S. § 1825-B(1).  DAFS, through its Bureau of General Services, oversees and assists state agencies with the purchase of goods and services.  *Id.*; 5 M.R.S. §§ 1811(1), 1812 (2025).

[2]  The State of Maine divides the state into eight transit regions for various administrative purposes.  *See* Me. Dep't of Transp., Me. Transit Regions Map, *available at* https://www.maine.gov/dot/sites/maine.gov.dot/files/2023-10/TransitDistricts_2018_nolegend.pdf [https://perma.cc/Z2KM-Z7B5].  Waldo County is part of Region 5.  *See id.*

developed a Request for Proposals (RFP). The RFP was posted on May 15, 2023, with a deadline for submissions of July 11, 2023.

[¶7] Part IV of the RFP set out the requirements for submitted proposals, and at the outset stated: "This section contains instructions for Bidders to use in preparing their proposals. The Department seeks <u>detailed yet succinct</u> responses that demonstrate the Bidder's qualifications, experience, and ability to perform the requirements specified throughout the RFP." The instructions included the following admonition:

> The Bidder's proposal must follow the outline used below, including the numbering, section, and sub-section headings. *Failure to use the outline specified in PART IV, or failure to respond to all questions and instructions throughout the RFP, may result in the proposal being disqualified as non-responsive or receiving a reduced score.* The Department, and its evaluation team, has sole discretion to determine whether a variance from the RFP specifications will result either in disqualification or reduction in scoring of a proposal.

(Emphasis added.)

[¶8] The RFP also provided a process to address bidders' questions: "It is the responsibility of all Bidders and other interested parties to examine the entire RFP and to seek clarification, in writing, if they do not understand any information or instructions." Questions were to be submitted to the RFP coordinator via a designated form. The RFP coordinator did not receive any

questions or requests for clarification from Waldo CAP concerning the portion of the RFP at issue here.

[¶9]  Part IV also set out the required format and contents for proposals, which were to be organized and scored in four sections:

- Section I – Preliminary Information (No points)
- Section II – Organization Qualifications and Experience (25 points)
- Section III – Proposed Services (50 points)
- Section IV – Cost Structure Acknowledgement (25 points)

Because the cost for providing the services was fixed by state and federal Medicaid regulations, all bidders would receive the full twenty-five-point score for Section IV provided they included a completed, signed acknowledgement form agreeing to be bound by state and federal rates.  The highest combined total of points awarded for Sections II and III, therefore, would determine the successful bidder in each region.

[¶10]  Section II required bidders to submit additional information in an appendix, instructing bidders as follows:

> Bidders must complete **Appendix D** (Qualifications and Experience Form) describing their qualifications and skills to provide the requested services in the RFP. *Bidders must include three examples of projects which demonstrate their experience and expertise in performing these services* as well as highlighting the Bidder's stated qualifications and skills.

6

(Emphasis added.)  Appendix D prescribed a specific format for providing the information requested, namely four discrete blocks or boxes.

[¶11]   In the first box, bidders were instructed to "[p]resent a brief statement of qualifications, including any applicable licensure and/or certification."  There, bidders were required to "[d]escribe the history of [their] organization" with reference to "skills pertinent to the specific work required by the RFP and any special or unique characteristics of the organization which would make it especially qualified to perform the required work activities."  If more space was needed than the box would accommodate, bidders were instructed that they could "expand this form and use additional pages to provide this information."

[¶12]   Bidders were instructed to provide in the three boxes that followed—labeled "Project One," "Project Two," and "Project Three"—"a description of projects that occurred within the past five years which reflect experience and expertise needed in performing the functions described in the 'Scope of Services' portion of the RFP."  And for each one of the three projects, bidders were directed to indicate in the respective box a "Business Reference Name," "Reference Contact Person," "Telephone," and "E-Mail."

[¶13]  To evaluate the bids, DHHS convened a panel consisting of four DHHS employees as well as a coordinator who would not score the proposals but would facilitate the review process.  Approximately forty proposals from seven bidders were submitted for the eight regions statewide, including five proposals for Region 5.[3]  Per the RFP's instructions, panel members did not score proposals individually, but rather, after completing their individual reviews and taking notes, they met as a group to discuss and determine scores for Sections II and III by consensus.

**B.  Waldo CAP's Proposal**

[¶14]  In its proposal, Waldo CAP completed only two of Appendix D's four boxes—the first box, which contained the opening narrative, and the second box, for "Project One."  The opening narrative described Waldo CAP's history, mission, organizational and governance structure, licensing status, and the various services it provides.  The services listed included transportation services delivered through two distinct divisions—the MidCoast Connector division and the MidCoast Public Transportation division.

---

[3]  According to the reviewers' testimony, the average length of a proposal was more than 450 pages, and panel members spent hours reviewing, taking notes on, and then scoring each vendor's submission.

[¶15] The MidCoast Connector division provides the NET services that are the subject of the bid. Waldo CAP not only referenced these services in the narrative in Appendix D's first box but also, as discussed below, provided a more fulsome description of these services in the "Project One" box. The latter division, the MidCoast Public Transportation division, also was referenced in the narrative portion of Appendix D. Waldo CAP noted there that its MidCoast Public Transportation division was "the Maine Department of Transportation's designated Federal Transit Authority" in four counties, where the division "continu[es] to provide services to the remainder of its traditional clients, including The Maine Department of Education, The Maine Department of Health and Human Services, The Office of Aging and Disabilities, [and] private foundation programs such as the John T. Gorman Foundation and the Maine Cancer Foundation." Waldo CAP provided no further details as to any of these particular services.

[¶16] In the "Project One" box, Waldo CAP provided a detailed, seven-page description of the "MidCoast Connector NET Brokerage" service, which it had previewed in the opening narrative. In addition, Waldo CAP provided a "Business Reference Name," "Reference Contact Person,"

"Telephone" number, and "E-Mail" address with respect to this project in the corresponding spaces designated.

[¶17]  The "Project Two" and "Project Three" boxes were left blank except for the entry "NA" in the "Description of Project" section of each.

[¶18]  The review team gave the Waldo CAP proposal a score of eighteen points out of twenty-five points for Section II.  The reviewers deducted seven points from their total score for Section II because Waldo CAP did not complete Appendix D as required; that is, it failed to provide any detailed information about two additional projects.  Although Waldo CAP received a score of forty-eight out of fifty on Section III (Proposed Services)—the highest Section III score of the Region 5 bidders—ModivCare received a higher overall score and thus was awarded the contract.

## C.    DAFS Appeal Committee Decision and Judicial Review

[¶19]  Waldo CAP requested, and was granted, an opportunity to appeal from the DHHS decision to award the Region 5 contract to ModivCare. *See* 5 M.R.S. § 1825-E(2).[4]  The DAFS appeal committee held a consolidated

---

[4] The statute provides,

> Persons aggrieved by an agency contract or grant award decision under this subchapter may request a hearing of appeal.  Such a request must be made to the Director of the Bureau of General Services in writing within 15 days of notification of the award.  The Director of the Bureau of General Services shall grant a hearing of appeal unless:

10

hearing on March 20-22, 2024, to consider both Waldo CAP's appeal of the Region 5 contract and another bidder's appeal of a contract award for a different region.

[¶20]  The committee heard testimony regarding Waldo CAP's appeal from members of the review panel and the chief executive officer (CEO) of Waldo CAP.  One reviewer testified that the review team had determined by consensus that the point deduction on Section II was justified for several reasons:

- The reviewers considered the entry of "NA" in the two boxes designated for information about examples of Waldo CAP's second and third projects to mean "not applicable," and therefore the required information was not provided;

- Strict compliance with the instructions was necessary given the large number of proposals submitted and the lack of time to search for information;

---

**A.** The Director of the Bureau of General Services determines that:

  **(1)** The petitioner is not an aggrieved person;

  **(2)** A prior request by the same petitioner relating to the same contract or grant award has been granted;

  **(3)** The request was made more than 15 days after notice of contract or grant award; or

  **(4)** The request is capricious, frivolous or without merit; or

**B.** No contract or grant was awarded.

5 M.R.S. § 1825-E(2).

- No other proposal reviewed had failed to provide information about other projects in the Project Two and Project Three boxes;

- Even though many other proposals referenced projects in the opening narrative section of Appendix D, they still provided more detailed information about the same projects where indicated in the three boxes provided and did not leave the boxes blank; and

- The reviewers felt that they had to deduct the seven points because Waldo CAP's proposal omitted information that the RFP plainly required.

The CEO of Waldo CAP testified that the boxes were marked "NA" because Waldo CAP believed that sufficient information about other projects had been provided in the opening narrative and that its proposal should be succinct and avoid redundancy.

[¶21] The appeal committee issued a written decision dated April 18, 2024, concluding that the defect was sufficiently substantive to justify the point deduction and that the deduction did not violate statutory requirements. The committee further determined that the scoring was fair, and not arbitrary or capricious, given the explicit instructions provided by DHHS indicating that the score may be lowered if the RFP was not completed and submitted in accordance with the RFP's instructions.

[¶22] On May 23, 2024, which no party disputes was within "30 days after receipt of notice" of the decision, 5 M.R.S. § 11002(3) (2025), Waldo CAP filed a petition in the Superior Court for review of the appeal committee's final

12

agency action. The court accepted the case for transfer to the Business and Consumer Docket in June 2024. Following briefing and a hearing, the court entered a judgment on January 28, 2025, affirming the decision of the appeal committee. Waldo CAP timely appealed. *See* 5 M.R.S. § 11008 (2025); M.R. App. P. 2B(c)(1). Upon Waldo CAP's motion and without objection by the other parties, we stayed the decision awarding the contract pending appeal.

## II. DISCUSSION

[¶23] Waldo CAP challenges the decision to award the Region 5 contract to another bidder on two principal grounds. First, it maintains that the award of the contract to ModivCare "has nothing to do with the quality of the NET services to be supplied" and therefore violates the requirement in 5 M.R.S. § 1825-B(7) that contracts be awarded to the "best-value bidder." Second, Waldo CAP contends that deduction of seven points from its score in Section II has "no rational explanation" and therefore "is the very definition of a decision that is arbitrary or capricious." Waldo CAP requests that the award to ModivCare be invalidated and that DHHS be "remind[ed . . .] that on remand, [it] must follow § 1825-B(7) by awarding Region 5 to the best-value bidder."

[¶24] The decision by the DAFS appeal committee affirming DHHS's award of the Region 5 contract is final agency action subject to judicial review

pursuant to the Administrative Procedure Act, 5 M.R.S. §§ 11001(1), 11007 (2025), and Rule 80C of the Maine Rules of Civil Procedure. Because the Superior Court acts in an intermediate appellate capacity in a Rule 80C appeal, we review directly the decision of the DAFS appeal committee. *Pine Tree Legal Assistance, Inc.*, 655 A.2d at 1264; *see Wood v. Dep't of Inland Fisheries & Wildlife*, 2023 ME 61, ¶ 14, 302 A.3d 18; *Ouellette v. Saco River Corridor Comm'n*, 2022 ME 42, ¶ 8, 278 A.3d 1183.

[¶25] In a proceeding before the DAFS appeal committee, "[t]he evidence presented must specifically address and be limited to one or more of the following: A. Violation of law; B. Irregularities creating fundamental unfairness; or C. Arbitrary or capricious award." 18-554 C.M.R. ch. 120, § 3(2). The party challenging the contract award has the burden of proof, *id.*, and the appeals committee "shall look for clear and convincing evidence that one or more of the [foregoing] standards . . . has been proven by the petitioner," *id.* § 4(1). We review the decision by the DAFS appeal committee "for errors of law, factual findings unsupported by substantial record evidence, or an abuse of discretion." *E. Me. Conservation Initiative v. Bd. of Envtl. Prot.*, 2025 ME 35, ¶ 21, 334 A.3d 706; *see also* 5 M.R.S. § 11007(4)(C). We give considerable deference to an agency's interpretations of its own regulations, *see Palian v. Dep't of Health*

*& Human Servs.,* 2020 ME 131, ¶ 20, 242 A.3d 164, and may not substitute our judgment for that of the agency on questions of fact, *see* 5 M.R.S. § 11007(3). As the party with the burden of proof before the appeal committee, Waldo CAP is required to demonstrate on judicial review that the administrative record compels a contrary result. *See Kelley v. Me. Pub. Emps. Retirement Sys.*, 2009 ME 27, ¶ 16, 967 A.2d 676.

## A. The DAFS appeal committee correctly concluded that the Region 5 contract award did not violate 5 M.R.S. § 1825-B(7).

[¶26]   "The goal of statutory interpretation is to give effect to the Legislature's intent." *Manirakiza v. Dep't of Health & Hum. Servs.*, 2018 ME 10, ¶ 8, 177 A.3d 1264. "We review de novo an issue of statutory interpretation," construing the statute based on its plain, "unambiguous meaning unless the result is illogical or absurd." *Mutty v. Dep't of Corr.*, 2017 ME 7, ¶ 9, 153 A.3d 775 (quotation marks omitted). "When a statute administered by an agency is ambiguous, we review whether the agency's interpretation of the statute is reasonable and uphold its interpretation unless the statute plainly compels a contrary result." *Manirakiza*, 2018 ME 10, ¶ 8, 177 A.3d 1264 (quotation marks omitted).

[¶27]   The Legislature authorized DAFS, through its Bureau of General Services, to purchase—and assist other state agencies in purchasing—goods

and services "required by the State Government or by any department or agency thereof" using competitive bidding, except as otherwise provided by law. 5 M.R.S. § 1811(1) (2025); *see* 5 M.R.S. §§ 1812, 1825-B (2025). Competitively bid contracts "must be awarded to the best-value bidder, taking into consideration the qualities of the goods or services to be supplied, their conformity with the specifications, the purposes for which they are required, the date of delivery and the best interest of the State." 5 M.R.S. § 1825-B(7).

[¶28] Section 1825-B(7) does not define "best-value bidder."[5] The statute's next section, 5 M.R.S. § 1825-C (2025), directs the state's Chief Procurement Officer to adopt rules to "govern[] the purchase of services, the awarding of grants or contracts and the procedure by which aggrieved persons may appeal award decisions made by a department or agency of State Government." 5 M.R.S. § 1825-C; *see* 18-554 C.M.R. ch. 110 (effective April 22, 2010).

[¶29] The rules as promulgated inform an interpretation of the term "best-value bidder" in section 1825-B(7). The rules governing the purchase of

---

[5] In 1997 the term "best-value bidder" replaced language in the statute referencing the "lowest responsible bidder" through an amendment originating in the Legislature's State and Local Government Committee. *See* P.L. 1997, ch. 263, § 1 (effective Sept. 19, 1997); Comm. Amend. A to L.D. 1220, No. S-147 (118th Legis. 1997). The change was made "to accept the best-value bidder as opposed to the lowest responsible bidder" and permit "the State to consider other matters, such as compliance with state and federal laws as well as other fiscal impacts in determining a contract award." Comm. Amend. A to L.D. 1220, Summary (118th Legis. 1997).

services provide that all RFPs are to be reviewed by the Contract Review Committee of DAFS before being released. 18-554 C.M.R. ch. 110, § 2(A)(ii). After an RFP has been issued, the contracting agency must review all proposals "based on the criteria established within the original Request for Proposal document." *Id.* § 3(A). A contracting agency lacks authority to eliminate, modify, or deviate from the RFP requirements later than seven days before the opening date for the RFP, *id.* § 2(A)(iv)(cc), and an "[a]ward must be made to the highest rated proposal which conforms to the requirements of the state *as contained in the RFP*," *id.* § 3(A)(iv) (emphasis added).

[¶30] Interpreting these statutes and regulations based on their plain meaning, the "best-value bidder" is the bidder selected based strictly on the criteria and requirements set forth in an RFP. In other words, the RFP's requirements reflect not only the qualifications and characteristics deemed relevant to determining the "best-value bidder" but also the specific information that the agency requires to make that determination. The bidder that meets those requirements, provides all requested information, and scores the highest rating is the "best-value bidder." The RFP explicitly states that its purpose is to "ensure that the contract is awarded to the Bidder whose proposal provides the best value to the State of Maine." *See also* 5 M.R.S. § 1825-B(7)

(providing that among the factors to be considered in determining the "best-value bidder" is "the best interest of the State").

[¶31] Waldo CAP's interpretation and application of "best-value bidder" for purposes of the NET brokerage RFP focuses predominantly, if not exclusively, on a single criterion—quality of services to be supplied—in section 1825-B(7). While that is indisputably a central factor in the statutory formula for determining the "best-value bidder," there are other factors as well. The thrust of Waldo CAP's argument is that because it scored higher on the RFP's Section III—Proposed Services—and because it was the established, incumbent provider of those services in Region 5, it is a logical inevitability to conclude that it should have been awarded the contract and the decision to do otherwise based on the contents of Section II violated section 1825-B(7).

[¶32] This argument is misguided and assumes an overly narrow interpretation of the statute as applied here. The RFP sought specific information to evaluate the bidders' *overall NET brokerage expertise,* not just a bidder's experience or the quality of services provided in a particular region. The fact that a bidder is the incumbent service provider in a particular region does not give it a scoring advantage with respect to the overall organizational

18

qualifications and experience at the core of Section II of the RFP.[6]  Hence, DHHS had a rationale for requesting three specific examples of projects involving relevant services.

[¶33]  Waldo CAP's contention that it should have been "the presumptive best-value bidder in Region 5" because it scored highest on Section III disregards the full scope of the RFP and particularly the information sought in Section II.  A higher score on Section III was not the sole determining factor in determining the successful bidder.  Indeed, the formula specifically apportions weight for each consideration, with Section II accounting for twenty-five points and Section III accounting for fifty points.  Here, the RFP required consideration of all relevant factors according to the scoring formula, including the quality of services to be supplied and the overall qualifications and experience of the bidder.  This is consistent with section 1825-B(7)'s requirement that the "best interest of the State" is a factor in determining that "best-value bidder."  The appeal committee's affirmance of DHHS's award of the contract to ModivCare does not constitute a violation of the statute.

---

[6]  The record indicates that the successful bidder in Region 5, ModivCare, has substantial experience in providing these services.  It has participated in Maine's NET brokerage program since 2013, serving five of the eight transit regions compared with Waldo Cap's one, and brokers over a million trips annually across the state compared with Waldo CAP's 1.6 million total trips since 2014.

**B.** **The record before the appeal committee did not compel a finding that DHHS's decision on the Region 5 contract was arbitrary or capricious.**

[¶34]  We use a highly deferential standard in reviewing whether a decision of an administrative agency was "arbitrary or capricious."  *AngleZ Behav. Health Servs. v. Dep't of Health & Hum. Servs.*, 2020 ME 26, ¶ 23, 226 A.3d 762.  An administrative agency does not act arbitrarily or capriciously "unless its action is wilful and unreasoning and without consideration of facts or circumstances."  *Id.* (quotation marks omitted).  If the evidence can support the agency's findings, we will affirm those findings.  *See id.* ¶ 26.

[¶35]  As noted above, the standard of proof that Waldo CAP was required to meet in order for the appeal committee to invalidate the award was proof by clear and convincing evidence.  *See supra* ¶ 25; 18-554 C.M.R. ch. 120 § 4(1) ("The Appeal Committee shall consider all evidence entered into the record and shall look for clear and convincing evidence that one or more of the standards set forth in Section 3, Subsection B, of these rules has been proven by the petitioner.").[7]  Thus, it "could have prevailed only if it convinced the appeal committee that the truth of its factual contentions was highly probable, rather than merely more probable than not."  *Pine Tree Legal Assistance, Inc.*, 655 A.2d

---

[7]  The reference to "Section 3, Subsection B" must be understood to mean section 3, *subsection 2*, which supplies the appeal criteria.  18-554 C.M.R. ch. 120, §§ 3(2), 4(1).

at 1264. "We will vacate the committee's determination that [the appellant] failed to carry its burden of proof on this issue only if the nature of the evidence is such that the committee was *compelled to find* [the appellant]'s contentions highly probable." *Id.* (emphasis added).

[¶36] Applying this high standard in a prior case, we affirmed the decision of an appeal committee when the review panel members had individually scored the vendors. but the panel had been unable to decide between two vendors, and the director of the agency had "convened a second panel and combined the first-place votes of that panel with those of the first." *Id.* at 1262, 1264. There, "the evidence did not compel the appeal committee to believe that this irregularity rendered the selection process fundamentally unfair." *Id.* at 1264. "Nor [could] it be said on [that] record that the decision was arbitrary or capricious." *Id.*

[¶37] Here, the appeal committee was not persuaded, by clear and convincing evidence, that the review panel acted arbitrarily or capriciously in deducting points for the two blank project boxes in Appendix D. Reviewing the appeal committee's decision, we cannot conclude that the record compels a finding that the review panel's point deduction was arbitrary or capricious. One reviewer testified that compliance with the instructions mattered due to

the amount of time involved in reviewing applications and the infeasibility of combing the proposals for missing or misplaced information. That reviewer also testified that all other vendors clearly understood that all three boxes had to be completed for all projects to be considered, even if those projects had been referenced briefly in the initial narrative portion of Appendix D. The panel, he testified, was also concerned with fairness to those who *had* provided the information that was plainly required.

[¶38] An examination of the proposals themselves further supports the review panel's decision to deduct points. In contrast to Waldo CAP's proposal, the proposals of all other bidders provided the three examples required in Appendix D. Even though it was the incumbent in Region 5, Waldo CAP could not rely on its reputation with state workers who may be familiar with its performance; it had to submit a complete proposal. The record reveals that one of the reviewers was not independently familiar with Waldo CAP. Moreover, all reviewers appropriately focused on the information provided in each proposal, with one observing in his testimony before the appeal committee: "If we had awarded [Waldo CAP] the contract with those omissions, I think we'd be right here again under appeal . . . for overlooking something that clearly was required."

[¶39]  Finally, Waldo CAP suggests that the panel's selection of a seven-point deduction as opposed to some other number of points was arbitrary.  The record is sufficient, however, to support the appeal committee's decision to affirm that choice.  The review panel, for example, took a deeper deduction—of twelve points—from the Section II score of another Region 5 proposal.  The panel found that although that bidder had provided three relevant project examples, (1) the bidder "[d]id not provide a clear description of [a] subcontractor's organizational capacity," (2) it was unclear based on the organizational chart whether the project team would be physically located in Maine, and (3) the bidder "[d]id not provide letters from surety companies as required by the RFP."  The review panel might not have had a precise rubric for its point deductions, but rigid mathematical certainty is not required.  *See Pine Tree Legal Assistance, Inc.*, 655 A.2d at 1264.

[¶40]  On the record before the appeal committee, therefore, we cannot say that the evidence compelled a finding, by clear and convincing evidence, that the review panel's scoring resulting in the award of the contract to ModivCare was arbitrary or capricious, and we affirm the judgment affirming the appeal committee's decision.

The entry is:

> Judgment affirmed.  Stay of the decision
> awarding the contract lifted.

_____

Brent A. Singer, Esq. (orally), Rudman Winchell, Bangor, for appellant Waldo Community Action Partners

Aaron M. Frey, Attorney General, and Halliday Moncure, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Department of Administrative and Financial Services

Aaron M. Frey, Attorney General, Brendan Kreckel, Asst. Atty. Gen., and Margaret Machaiek, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Health and Human Services

A. Robert Ruesch, Esq. and Sarah K. Grossnickle, Esq., Verrill Dana, LLP, Portland, for appellee ModivCare Solutions, LLC

Business and Consumer Court Docket docket number APP-2024-00009
FOR CLERK REFERENCE ONLY